IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DANIEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 09-4140 |
| | § | |
| UNIVERSAL ENSCO, INC., | § | |
| | § | |
| Defendant. | § | |

## O R D E R

Pending before the Court is Defendant's Motion for Summary Judgment.  (Instrument No. 18).

### I.

### A.

Plaintiff, John Daniel ("Daniel" or "Plaintiff"), brings the instant suit against Defendant Universal Ensco, Inc. ("UEI" or "Defendant") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 (the "ADEA"), and the Texas Commission on Human Rights Act (the "TCHRA").  Plaintiff alleges that Defendant discriminated against him on the basis of religion, national origin and age, and that Defendant retaliated against him for opposing a discriminatory practice or making a charge of discrimination. [1]  (Instrument No. 14, at 5-8; Instrument No. 26, at 2).  Plaintiff seeks an award of back pay and interest on back pay; compensation for future lost wages; compensatory

---

[1] Plaintiff's Amended Complaint also included a claim for discrimination on the basis of race.  (*See* Instrument No. 14, at 5, 6).  However, Plaintiff dismissed this claim in his Response to Defendant's Motion for Summary Judgment. (*See* Instrument No. 26, at 2).

damages; punitive damages; liquidated damages; expert fees, costs and attorneys' fees; and other general and equitable relief to which Plaintiff may be deemed entitled, including pre- and post-judgment interest. (Instrument No. 14, at 7-8).

## B.

Plaintiff was born in Iran on March 11, 1944. (Instrument No. 26-1, at 1; Instrument No. 14, at 4). He emigrated to the United States in March of 1973. (Instrument No. 26-1, at 1). He is a registered engineer. (Instrument No. 14, at 3). Plaintiff has identified himself as Muslim in his Complaint. (Instrument No. 14, at 4). However, in his deposition he states that, although he was born in the Muslim faith, he has not believed in Muslim precepts or practiced the Muslim faith since the age of 7. (Instrument No. 18-1, at 9-10).

Defendant UEI is a Houston-based pipeline-engineering firm in the energy industry. (*See* Instrument No. 18, at 8-9). In February 2008, UEI became part of a larger company called Universal Pegasus International ("UPI"). (*See* Instrument No. 18, at 8-9).

Plaintiff first worked for UEI from 2001 until 2003. During this first period of employment he states that he "was working in UEI through an agent and not direct, so UEI didn't know about my age or salary." (Instrument No. 26-1, at 1, 3). Plaintiff again worked for UEI from July of 2006 until his termination in February of 2009. (Instrument No. 26-1, at 1, 12). The instant claims are related to only his second period of employment. (*See* Instrument No. 26, at 2).

In July of 2006, when Plaintiff began his second period of employment with UEI, he was 62. (Instrument No. 18-1, at 11). He began working as a Lead Mechanical Engineer, a position in which he supervised some engineering staff, a lead mechanical designer, and design and

drafting staff.  (Instrument No. 18-1, at 52; Instrument No. 14, at 3).  Plaintiff's immediate supervisor was Mark Netzel ("Netzel"), a Project Manager.  (Instrument No. 14, at 3; Instrument No. 18-1, at 12).  Plaintiff and Netzel were both supervised by Pano Zhonga ("Zhonga"), Vice President and Director of the Facility Group.  (Instrument No. 14, at 3; Instrument No. 18-1, at 12).

Plaintiff asserts that Netzel treated him worse than other engineers, and interfered with his decisions and work.  (Instrument No. 18-1, at 13).  For example, he states that Netzel would not give him adequate resources for his work, and would arrange meetings without consulting him.  (Instrument No. 18-1, at 13).

On September 17, 2007, Netzel gave Plaintiff an Employee Warning Notice.  (Instrument No. 18-1, at 54).  The notice concerned a September 6, 2007 conversation between Netzel and Plaintiff in which Netzel denied Plaintiff's request for an immediate plotting of certain drawings.  (Instrument No. 18-1, at 55; Instrument No. 26-1, at 4).  In the notice, Netzel wrote that after he denied Plaintiff's request:

> John became angry at this point and stated that if his request was denied "I would be sorry".  At this point I questioned John and asked if he was threatening me? He responded by saying that "I as well as the company would be sorry" and that his action would be "legal".

Instrument No. 18-1, at 55).  Netzel also wrote:

> Going forward John must understand that he as well as his coworkers are functioning in a fast paced resource constrained environment.  Therefore, sometimes his project will not have the top priority in his department.  At these times of inconvenience it is not acceptable to threaten the company, his piers [sic] or his supervisor.

(Instrument No. 18-1, at 55).

According to Plaintiff, Netzel gave him the notice with the backing of Zhonga "to punish me for my legitimate request." Plaintiff also states that Netzel gave him the notice after he "complained about discriminatory treatment." (Instrument No. 26-1, at 4). The record does not make clear how Plaintiff complained prior to receiving the notice, or whether he complained to Netzel, Zhonga, or some other person. (*See* Instrument No. 26-1, at 4; Instrument No. 18-1, at 13). However, Plaintiff states that after receiving the notice on September 17, 2007, he filed a complaint with Human Resources about it on the same day, alleging discrimination and retaliation. (Instrument No. 26-1, at 5).

At some point around the end of 2007, Plaintiff received a bonus which he states was "cut by $12,000." (Instrument No. 26-1, at 5). Plaintiff asserts that his bonus was reduced as retaliation for his complaints about discrimination and retaliation, including the complaint that he filed on September 17, 2007. (Instrument No. 26-1, at 2).

In December of 2007, Zhonga assigned Plaintiff to work on a different project, called the Enbridge project. (Instrument No. 18-1, at 12, 22). Zhonga states that he assigned Plaintiff to the Enbridge project to give him "a second chance" after "his symptoms of no team effort, having arguments with Netzel." (Instrument No. 18-1, at 22). However, Plaintiff states that "[s]ending me to the John Andrus group [to work on the Enbridge project] was more like sending me to exile, isolating me from my peers for more punishment and retaliation." (Instrument No. 26-1, at 5).

On the Enbridge project, Plaintiff worked under the immediate supervision of Hans Kast ("Kast"), in a group managed by Senior Vice President John Andrus ("Andrus"). (Instrument No. 18-1, at 22, 27). Zhonga states that because the Enbridge project was small, he told Plaintiff "[y]ou don't need a lot of resources... [i]ts only you." (Instrument No. 18-1, at 22). Andrus also states that he told Plaintiff, on his first day, that he would not have staff to supervise. Plaintiff denies that Zhonga or Andrus ever made these statements, and states that he was told that he would be given "all the staff and resources" needed for his job. (Instrument No. 26-1, at 6). Plaintiff also asserts that he was "denied the designers and draftsmen that I needed," and that this denial "confirms that the vice president [Zhonga] of the company conspired against me to retaliate and discriminate against me." (Instrument No. 26-1, at 6). In contrast, Andrus recalls Plaintiff complaining to him about "many things," but not about discrimination or retaliation. (Instrument No. 18-1, at 28). Furthermore, according to Andrus,

> by understaffed what he [Plaintiff] meant was that he wanted to supervise people who did the actual work counter to what I told him the day of his arrival would be the project structure where he would not have subordinates, that he would actually be doing the production work himself.

(Instrument No. 18-1, at 28). Andrus also recalled the following complaints from Plaintiff:

> John felt that his title was inappropriate for a person of his number of years of experience. He did not like working as a production engineer. He wanted to be a supervisor. He did not like his job title, his compensation including bonus. He did not like being restricted to project work hours. He did not like being restricted to casual attire on Fridays only.

(Instrument No. 18-1, at 28).

In order to work on the Enbridge project, Plaintiff was required to work out of a new physical location. (Instrument No. 18-1, at 27). Plaintiff states that the new office was "a storage room full of unwanted stuff, old computers, boxes, broken heaters... which humiliated me in front of other staff." (Instrument No. 26-1, at 6). However, Andrus states that Plaintiff's problem with the office was that it lacked windows. (Instrument No. 18-1, at 26-27). Andrus also states that the office was larger than windowed offices at the same location, and that when Plaintiff first arrived, no windowed offices were available. (Instrument No. 18-1, at 26-27).

Plaintiff states that, despite the obstacles he encountered on the Enbridge project, his assignments there, like all of his other assignments were completed with "excellent" results. (Instrument No. 26-1, at 7). However, Andrus states that by July of 2008, "John's contribution had been diminishing to the point where we could no longer in our minds fairly bill the client for his time and we [Kast and Andrus] decided instead to return him to the pool [managed by Zhonga] and finish the project ourselves." (Instrument No. 18, at 14; Instrument No. 18-1, at 29).

Around July of 2008, Zhonga assigned Plaintiff to a group supervised by Kent Bigelow ("Bigelow"), another Vice President. (Instrument No. 26-1, at 8; *see also* Instrument No. 18-1, at 115). Plaintiff states that he had worked for Bigelow during his first period of employment with UEI, and that Bigelow had discriminated against him after learning that he was from Iran and of Muslim faith. (Instrument No. 26-1, at 8). Plaintiff asserts that Zhonga knew of Bigelow's attitude toward him and sent him to Bigelow's group "to be punished even more" despite the fact that other positions were available in Zhonga's group. (Instrument No. 26-1, at 8-9). Plaintiff also asserts that that he was sent to Bigelow's group despite the fact that five

engineers, from countries such as Canada and Albania, the birthplace of Zhonga, had been hired for Zhonga's group while Plaintiff was working on the Enbridge project. (Instrument No. 26-1, at 8).

In Bigelow's group, Plaintiff was supervised by two engineers. (Instrument No. 26-1, at 9). Plaintiff states that the two engineers were lower in rank than himself, and were Jews who hated Muslims, especially those from Iran. (Instrument No. 26-1, at 9). Plaintiff also states that the engineers "would give conflicting instructions to me and report adversely to Kent Bigelow who would encourage them to discriminate and humiliate me." (Instrument No. 26-1, at 9).

On December 8, 2008, Netzel gave Plaintiff a performance evaluation in which Plaintiff was rated an overall three (3) out of ten (10). (Instrument No. 18-1, at 103-105). The evaluation was based in part on comments from Andrus, Kast and Bigelow. (Instrument No. 18-1, at 115). In the evaluation, Netzel stated that Plaintiff "has demonstrated lapses in judgment through his interactions with his project team in the John Andrus group as well as in the Kent Bigelow group." (Instrument No. 18-1, at 104). Netzel also stated that Plaintiff's project managers "felt that John's team work" and "ability to cooperate with his coworkers needs significant improvement." (Instrument No. 18-1, at 104-105). In addition, he stated that Plaintiff's project managers "indicated that his attendance needs improvement," and that his work pace was "average" but "could improve by being more flexible with meeting the clients accelerated work schedule." (Instrument No. 18-1, at 103-104). With respect to Plaintiff's technical skills, Netzel stated that Plaintiff "needs to deepen his technical knowledge of typical equipment used in pipeline facilities," that "his drawing development work was of acceptable quality," and that he "demonstrates a good understanding of the drawing design cycle." (Instrument No. 18-1, at

104). Netzel also stated that Plaintiff's project managers "have given him an average rating for … paying attention to detail." (Instrument No. 18-1, at 105).

Netzel signed the evaluation on December 17, 2008. However, Plaintiff did not sign the evaluation. In handwritten text below Netzel's signature, Netzel wrote:

> At this time John is uncomfortable signing this review. John feels that the comments in this review are in conflict with verbal statements and emails he has received from John Andrus, Hans Kast and Kent Bigelow. John intends to follow up with a personal statement.

(Instrument No. 18-1, at 105).

On January 9, 2009, Plaintiff emailed Zhonga, Netzel and two other individuals, Marcello Minotti and Donovan King ("King"), regarding his performance evaluation. (Instrument No. 18-1, at 60-61). King was the Human Resources Manager for UEI. (Instrument No. 18-1, at 110). In the email, Plaintiff stated that the evaluation was "like a shock" after receiving what he described as "close to excellent" evaluations in the past, as well as a "high level of satisfaction of the client." (Instrument No. 18-1, at 60). Plaintiff also states that he had asked Netzel for the project manager comments which were the basis for the evaluation, but had been denied on the basis of confidentiality. (Instrument No. 18-1, at 60). Plaintiff argued that denying him access to the project manager comments was unfair, "as if I am handcuffed and blindfolded trying to guess what is happening around me." (Instrument No. 10-1, at 60). Finally, he stated that he would provide his personal statement in response to the evaluation by January 15, 2009. (Instrument No. 18-1, at 60).

On January 19, 2009, Plaintiff emailed Andrus, King, and Sherri Manning ("Manning"), the Vice-President of Human Resources.  (Instrument No. 26-2; Instrument No. 18-1, at 33). The email was titled "Complaint for unfair performance evaluation."  (Instrument No. 26-2, at 1).  In the email, Plaintiff argued that it was unfair for Andrus to deny him access to Andrus's comments to Netzel regarding his evaluation, cited examples where Kast, Andrus or UEI clients praised the projects that he worked on, and asked "[d]id you [Andrus] want all the project staff [to] think that you were thankful to me in [sic] the surface, only to hide your true intention which was to help Pano [Zhonga] to destroy my reputation?"  (Instrument No. 26-2, at 1-7).   In addition, Plaintiff asked:

> Don't you think my rights have been violated and I have been treated unfairly and unjustly?  Do you treat all employees this way or is it only me?  Don't you think that you are discriminating against me?

(Instrument No. 26-2, at 2).

On February 2, 2009, Plaintiff emailed King and Manning alleging that

> He [Zhonga] has always been unfair and unjust to me and treated me with discrimination, intimidation, humiliation and retaliation.  In 2008 he has expanded his unlawful practices teaming up with other parties conspiring against me, to punish retaliate and discriminate against me even more.

(Instrument No. 18-1, at 63).  Plaintiff attached 23 documents to the email, consisting of emails between Plaintiff, Zhonga, Netzel, and others.  (Instrument No. 18-1, at 64-91).  The emails include Zhonga's 2006 job offer to Plaintiff of the position of Lead Mechanical Engineer, as well as communications concerning organizational changes, praise for work on various projects, and logistics concerning the completion of work on various projects.  (*See* Instrument No. 18-1, at

64-91).   Plaintiff states in his email to King and Manning that the documents "prove the contrary" of his 2008 performance evaluation.

In response to Plaintiff's emails, King states that he conducted an investigation into Plaintiff's 2008 performance evaluation and his discrimination and retaliation claims. (Instrument No. 18-1, at 112).   According to King, he spoke to Plaintiff, as well as Zhonga, Andrus, Netzel, and Marcello Minotti.   (Instrument No. 18-1, at 112).   He also reviewed documents pertaining to Plaintiff's job performance. (Instrument No. 18-1, at 112). Ultimately, he determined that Plaintiff's claims of discrimination and retaliation were unfounded. (Instrument No. 18-1, at 112).   However, Plaintiff states that King never investigated his claims. (Instrument No. 26-1, at 2).   Plaintiff furthermore states that he made complaints of discrimination and retaliation in 2007, 2008, and 2009, throughout his second period employment with UEI.  (Instrument No. 26-1, at 2-3).

In 2009, UPI reduced its workforce by laying off 143 employees.  (Instrument No. 18-1, at 45-48, 108).  According to Wendy Lynn Donahue ("Donahue"), the Vice President of Human Resources with Universal Pegasus International ("UPI"), the lay-offs were UPI's response to a reduction in billable work in 2008.  (Instrument No. 18-1, at 107).  Donahue states that UPI's management decided that the first round of lay-offs would involve employees who had received a score of 4 or below on their 2008 performance evaluations, and that the second round would involve employees who had received a 5 or 6 on their evaluations.  Donahue also states that, as a matter of practice, the laid-off employees were not offered other positions within UPI. (Instrument No. 18-1, at 111).

10

UPI's records show that Plaintiff was laid off on February 20, 2009, and that other employees were laid off as early as January of 2009.  (Instrument No. 18-1, at 46).  UPI's records also show that, of the 143 laid-off employees, 15 including Plaintiff were engineers. (Instrument No. 18-1, at 45-48).  Within the group under Zhonga's supervision, 17 employees including Plaintiff were laid off.  (Instrument No. 18-1, at 46).  Of the 17 laid-off employees, Donahue states that six were between the ages of 25 and 40; eight were between the ages of 41 and 57; two (Plaintiff and another employee) were 64; and one was 73.  (Instrument No. 18-1, at 111).  Donahue also states that two of the employees were of Canadian descent, and that she did not know the national origins of the others.  (Instrument No. 18-1, at 112).  In addition, Zhonga states that no one replaced Plaintiff in his position after he was terminated.  (Instrument No. 18-1, at 23).

Plaintiff states that he was laid off on February 13, 2009, before any workforce reduction occurred.   (Instrument No. 26-1, at 12).   Plaintiff also argues that his termination was discriminatory in comparison to other engineers who were not terminated.  (Instrument No. 26-1, at 11).  According to Plaintiff, four or more engineers were hired in Zhonga's group in the second of half of 2007 and in 2008, in order to eliminate the need for his position.  (Instrument No. 26-1, at 11).  These engineers were not laid-off, and were from countries such as Canada and Albania, which Plaintiff asserts is the birth place of Zhonga.  (Instrument No. 26-1, at 11). Plaintiff also asserts that, in addition to these four or more engineers, many other engineers were not laid-off despite the fact that they were newly hired, were substantially younger than him, and had less experience and fewer accomplishments.  (Instrument No. 26-1, at 11).  Finally, Plaintiff

asserts that eleven days before his termination, he was replaced by a 40 year old senior project engineer. (Instrument No. 26-1, at 11).

## C.

On July 2, 2009, Plaintiff filed a charge of discrimination with the EEOC alleging discrimination on the basis of religion, national origin and age, as well as retaliation. (Instrument No. 18-1, at 93). On October 30, 200, the EEOC issued Plaintiff a notice of right to sue stating that he must file suit under Title VII or the ADEA within 90 days. (Instrument No. 18-1, at 101).

Plaintiff filed his original Complaint against Defendant in the 133rd Judicial District Court of Harris County, Texas, on December 1, 2009. (Instrument No. 1-2). In response, Defendant filed its original Answer on December 21, 2009. (Instrument No. 1-3). Defendant removed the case to the instant Court on December 30, 2009. (Instrument No. 1).

Plaintiff filed his First Amended Complaint in the instant Court on July 31, 2010. (Instrument No. 14). In the First Amended Complaint, Plaintiff alleges that Defendant discriminated against him on the basis of race, religion, national origin and age, and that Defendant retaliated against him for opposing a discriminatory practice or making a charge of discrimination. (Instrument No. 14, at 5-8; Instrument No. 26, at 2). Plaintiff's claims of discrimination on the basis of race, religion and national origin, as well as Plaintiff's claim of retaliation, are made under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act (the "TCHRA"). (Instrument No. 14, at 5-8). Plaintiff's claims of discrimination on the basis of age are made under the Age Discrimination in Employment Act of 1967 (the "ADEA"), and the TCHRA. (Instrument No. 14, at 6-8). Plaintiff seeks an award of back pay and interest on back pay; compensation for future lost wages;

compensatory damages; punitive damages; liquidated damages; expert fees, costs and attorneys' fees; and other general and equitable relief to which Plaintiff may be deemed entitled, including pre- and post-judgment interest. (Instrument No. 14, at 7-8).

Defendant filed its First Amended Answer on July 31, 2010. (Instrument No. 15). In the First Amended Answer, Defendant asserts twelve affirmative defenses. Defendant asserts that Plaintiff fails to state a claim upon which relief can be granted; that Plaintiff failed to exhaust his administrative remedies; and that Plaintiff's retaliation claims are barred to the extent he failed to exercise good faith in reporting a violation of the law. (Instrument No. 15, at 1-4). Defendant also asserts that Plaintiff was an at-will employee who could be terminated at any time and for any reason; that Defendant's actions were made in good faith and were legitimate; that to the extent that Plaintiff shows that his age, race, religion, or national origin were a motivating factor in the employment decisions at issue, that Defendant would have made the same decision regardless. (Instrument No. 15, at 1-4). Defendant furthermore asserts that Defendant has exercised reasonable care to prevent and correct any discriminatory or harassing behavior, and that Plaintiff unreasonably failed to avail himself of the preventative and corrective measures provided by Defendant. (Instrument No. 15, at 3). In addition, Defendant asserts that Plaintiff's claims for damages should be reduced to the extent Plaintiff failed to mitigate his damages; that Plaintiff cannot recover under the after-acquired evidence doctrine to the extent he engaged in conduct which, if known by Defendant, would have caused him not to be hired or to be terminated by Defendant; that any award of exemplary damages violates the due process clauses of United States and Texas Constitutions; and that any award of damages should be subject to the applicable statutory caps and limits. (Instrument No. 15, at 1-4). Finally, Defendant asserts that

Defendant is entitled to recover costs and attorney's fees to the extent that the suit is frivolous. (Instrument No. 15, at 2).

Defendant filed its Motion for Summary Judgment on March 1, 2011. (Instrument No. 18). Defendant seeks dismissal of all of Plaintiff's claims, for discrimination on the basis of basis of race, religion, national origin and age, as well as Plaintiff's claim for retaliation. (Instrument No. 18, at 7). Defendant argues that Plaintiff failed to exhaust administrative remedies with respect to his race discrimination claim. (Instrument No. 18, at 18-20). Defendant also argues that Plaintiff has failed to establish a *prima facie* case of discrimination for race, religion, national origin, or age; that Defendant's actions were legitimate and nondiscriminatory; and that Plaintiff cannot show that Defendant's reasons for acting were false or based Plaintiff's protected status. (Instrument No. 18, at 20-24). Defendant furthermore argues that Plaintiff cannot show religious discrimination because he admits that he does not practice a religion, and that Plaintiff cannot show age discrimination because Defendant hired him twice when he was over the age of 40. (Instrument No. 18, at 24-27). Finally, Defendant argues that Plaintiff has failed to establish a *prima facie* claim of retaliation; that Defendant's actions were legitimate and nondiscriminatory; and that Plaintiff cannot show that he would not have been laid-off but for his protected activity. (Instrument No. 18, at 27-31).

On May 26, 2011, the Court ordered Plaintiff to file a response to Defendant's motion. (Instrument No. 25). In response to that order, Plaintiff filed his Response to Defendant's Motion for Summary Judgment on June 2, 2011. (Instrument No. 26). In his Response, Plaintiff dismisses his claim of discrimination based on race. (Instrument No. 26, at 2). Plaintiff also

14

asserts that there are issues of fact on his discrimination claims based on age, religion, and national origin, as well as his claim of retaliation. (Instrument No. 26, at 4).

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also U.S. v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248. If the evidence rebutting the motion for summary judgment is only colorable or is not significantly probative, summary judgment should be granted. *See Id.* at 2511; *see also Thomas v. Barton Lodge, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999). The summary judgment procedure, therefore, enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886-88 (1990).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he

nonmoving party must come forward 'with specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 586-87 (quoting FED. R. CIV. P. 56(e)) (emphasis in original). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1462 (5th Cir. 1995). To sustain the burden, the nonmoving party must produce evidence admissible at trial. *See Anderson*, 477 U.S. at 242; *see also Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) (stating that "[t]o avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue."). Further, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgement." *Ragas*, 136 F.3d at 458 (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

The Court reviews the facts in the light most favorable to the nonmovant and draws all reasonable inferences in favor of the nonmovant. *See Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.

Plaintiff alleges that Defendant discriminated against him on the basis of religion, national origin and age, and that Defendant retaliated against him for opposing a discriminatory practice or making a charge of discrimination.[2] (Instrument No. 14, at 5-8; Instrument No. 26, at 2). Plaintiff's claims of discrimination on the basis of religion and national origin and Plaintiff's

---

[2] Plaintiff's Amended Complaint also included a claim for discrimination on the basis of race. (*See* Instrument No. 14, at 5, 6). However, Plaintiff dismissed this claim in his Response to Defendant's Motion for Summary Judgment. (*See* Instrument No. 26, at 2).

claim of retaliation are made under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act (the "TCHRA"). (Instrument No. 14, at 5-8). Plaintiff's claim of discrimination on the basis of age is made under the Age Discrimination in Employment Act of 1967 (the "ADEA"), and the TCHRA. (Instrument No. 14, at 6-8).

## A.

A plaintiff may prove intentional discrimination under Title VII by showing direct evidence of discrimination or circumstantial evidence using the burden-shifting scheme articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Portis v. First Nat'l Bank of Albany*, 34 F.3d 325, 328 (5th Cir. 1994). To satisfy *McDonnell Douglas*, "(1) The plaintiff must first demonstrate a prima facie case of discrimination; (2) if successful, the burden of production shifts to the defendant to show a legitimate and nondiscriminatory basis for the adverse employment decision; and (3) finally, the plaintiff must show that the defendant's offered reason is pretext or unworthy of belief." *Id.* at 328, n.7.

The *McDonnell Douglas* framework and analogous federal case law apply to TCHRA actions. *See Evans v. City of Houston*, 246 F.3d 344, 349 (5th Cir. 2001); *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004). In addition, the *McDonnell Douglas* framework applies to ADEA actions. *See Guerrero v. Preston*, No. H-08-2412, 2009 WL 2581568 (S.D. Tex. Aug. 18, 2009); *Bell v. Raytheon Co.*, No. 3:08-CV-0702, 2009 WL 2365454, 8 (N.D.Tex. July 31, 2009).

**1.**

Plaintiff's response brief does not contain any legal analysis of his discrimination claims. However, in his affidavit, Plaintiff asserts two theories of discrimination.  In the first theory, Defendant discriminated against Plaintiff through actions such as denying him resources; reducing his bonus; giving him a warning notice, a bad office and a poor performance review; and transferring him to undesirable projects or discriminatory supervisors. (*See* Instrument No. 26-1, at 2-12).  In the second theory, Defendant additionally discriminated against Plaintiff by terminating him as part of Defendant's workforce reduction.  (*See* Instrument No. 26-1, at 2-12). The elements for the prima facie case of discrimination under each theory differ.

Generally speaking, a plaintiff establishes a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) a similarly situated employee outside of his protected class was treated more favorably.  *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

However, in a reduction-in-force case, a plaintiff establishes a *prima facie* case by showing (1) that he is a member of a protected class; (2) that he has been adversely affected by the employer's decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) that there is circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996); *Williamson v. American Nat. Ins. Co.*, 695 F.Supp.2d 431, 449-50 (S.D.Tex. March 2, 2010).

**a.**

The Court will first address Plaintiff's argument that Defendant discriminated against him by denying him resources; reducing his bonus; giving him a warning notice, a bad office and a poor performance review; and transferring him to undesirable projects or discriminatory supervisors. Plaintiff has established the first two prongs of his prima facie case. The Parties do not dispute that Plaintiff was a member of a protected class, or that he was qualified for the position that he held. (*See* Instrument No. 18, at 21-24; Instrument No. 26, at 4). However, Plaintiff must also establish that he was subject to an adverse employment action, and that a similarly situated employee outside of his protected class was treated more favorably. *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

**i.**

Adverse employment actions "include discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 819 (S.D. Tex. 1998) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). Courts have also found that "[s]uspensions and other disciplinary actions have been found to be adverse employment actions under [section 2000e-2 of] Title VII." *McGarity v. Mary Kay Cosmetics*, No. 3:96-CV-3413-R, 1998 WL 50460, *3 (N.D. Tex. Jan. 20, 1998). "Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Id; Ackel v. National Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).

There is no adverse employment action if the employee's "job, duties, compensation, or benefits" are unaffected. *Hunt v. Rapides Health Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th

Cir. 2001). In addition, a variety of less serious employment actions such as rudeness (even by supervisors), lateral reassignments with equal pay, and undesirable break schedules have been found insufficient to constitute an adverse employment action. *Aryain v. Wal-Mart Stores Tex. LLC*, 534 F.3d 473, 484-87 (5th Cir. 2008). Additionally, "trivial harms" such as "petty slights, minor annoyances and simple lack of good manner" are not considered adverse actions. *Burlington*, 548 U.S. at 68.

Plaintiff asserts that, throughout his employment, he was denied proper staff or resources to do his job. He also asserts that he was assigned a bad office during his time on the Enbridge project. In addition, he asserts that the employee warning notice from Netzel was discriminatory. However, he has not pointed to any evidence showing that these actions impacted his ability to take vacations, or chances for promotion. He has also not shown that the warning notice led to any serious consequences affecting his employment, such as a suspension or other disciplinary action. *See McGarity*, 1998 WL 50460, at *3. Defendant's denial of resources, office assignment and issuance of a warning notice are not adverse employment actions, because they are not ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating. *See McGarity*, 1998 WL 50460, at *3.

Plaintiff also argues that his transfer to the Enbridge project, as well as his transfer to the group of Vice-President Kent Bigelow ("Bigelow"), were adverse employment actions because they were demotions. To be equivalent to a demotion, a transfer need not result in a decrease in pay, title or grade. *Alvarado v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007). The transfer can be a demotion "if the new position proves objectively worse -- such as being less prestigious or less interesting or providing less room for advancement." *Alvarado*, 492 F.3d at 613 citing

*Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999).  It is an objective inquiry whether the new position is worse.  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004).  "[A] plaintiff's subjective perception that a demotion has occurred is not enough."  *Hunt*, 277 F.3d at 771 citing *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992).

According to Plaintiff, his transfer to the Enbridge project was a demotion because the Enbridge project was smaller than his previous projects, and because, in contrast to his previous projects, he did not supervise any staff on the Enbridge project.  (Instrument No. 26-1, at 3).  However, Plaintiff has  failed to provide objective evidence that the Enbridge project was worse than his previous position.  *See Alvarado*, 492 F.3d at 613.  For example, Plaintiff failed to allege that the transfer resulted in any change to his compensation, benefits or his job title.  Plaintiff also failed to provide evidence showing that the Enbridge project was less prestigious or that working on it would harm his opportunities for promotion.  The evidence shows that his transfer was a lateral assignment rather than an adverse employment action.  *See Aryain,* 534 F.3d at 484-87; *Alvarado*, 492 F.3d at 613.

Plaintiff also argues that his transfer to Bigelow's group was a demotion because Bigelow was known for being discriminatory against him, and because Bigelow put him under the supervision of two engineers who were Jewish and lower in rank than himself.  (Instrument No. 26-1, at 9).  According to Plaintiff, Bigelow discriminated against him by giving Netzel information which Netzel later incorporated into Plaintiff's performance review, and by encouraging the engineers above him "to discriminate and humiliate me." (Instrument No. 26-1, at 9).  Plaintiff furthermore asserts that the engineers above him discriminated against him by giving him "conflicting instructions."  (Instrument No. 26-1, at 9).

However, Plaintiff has failed to provide support for his arguments concerning his transfer to Bigelow's group. He has failed to provide evidence showing that Bigelow was known for being discriminatory against him, or that Bigelow's placement of him under two other engineers hurt his prestige or opportunities for advancement. He has not identified any discriminatory information that Bigelow gave to Netzel. He has also not provided any examples of how Bigelow encouraged the two engineers above him to discriminate and humiliate him. In addition, although Plaintiff asserts that the engineers above him gave him "conflicting instructions," he has failed to provide any examples of conflicting instructions. In fact, Plaintiff has failed to identify any changes to his job duties, compensation, or benefits which occurred after his transfer to the Bigelow group. The evidence does not support the inference that Plaintiff's transfer to Bigelow's group was an adverse employment action. *See Aryain v. Wal-Mart Stores Tex. LLC*, 534 F.3d at 484-87; *Alvarado*, 492 F.3d at 613.

In addition, Plaintiff argues that Defendant took an adverse employment action against him by reducing his bonus for 2007 by $12,000. (Instrument No. 26-1, at 2). Although the denial of a bonus has been found to be an adverse employment action for a discrimination claim in the Fifth Circuit, *see, e.g., Franklyn v. Tyson Foods, Inc.*, No. H-06-0371, 2007 WL 2315231 *5 (S.D.Tex. Aug. 10, 2007); *Lacher v. West*, 147 F.Supp.2d 538, 542 (N.D.Tex. June 8, 2001), the Court is not aware of any Fifth Circuit cases in which a reduction in bonus has qualified as an adverse employment action for a discrimination claim. However, in retaliation cases, courts have found an adverse employment action where a bonus has been denied but not where a bonus has been reduced. *Compare*, e.g., *Ford v. Diversified Technology, Inc.*, No. 3:99-CV-435WS, 2008 WL 5272090 (S.D. Miss. Dec. 17, 2008)(the employer's denial of a yearly bonus after

22

plaintiff had received a bonus for fifteen years qualified as an adverse employment action for a retaliation claim), *and Williams v. J.B. Parks Wholesale Florist, Inc.*, No. 3:95-CV-2599-D, 1997 WL 160194 (N.D. Tex. March 31,1997)(the employer's decision to take away a $50 cash bonus after the plaintiff had already received it qualified as an adverse employment decision for a retaliation claim), *with Turner v. DynMcDermott Petroleum Operations Co.*, No. 06-1455, 2010 WL 4363403 (E.D.La. Oct. 21, 2010)(the employer's reduction in bonus did not qualify as an adverse employment action for a retaliation claim where plaintiff had received a raise which canceled the effect of the reduction and the bonus was discretionary rather than part of the plaintiff's salary). The standard for finding an adverse employment action in a retaliation case is more expansive than the ultimate employment decision standard for finding an adverse employment action in a discrimination case. *See Burlington Northern*, 548 U.S. at 67. However, Plaintiff has not provided any case and the Court has not found any which establishes that a reduction in bonus as opposed to the denial of a bonus would qualify as an adverse employment action for a discrimination claim. Plaintiff's reduction in bonus therefore does not qualify as an adverse employment action.

Finally, Plaintiff argues that his performance review from Netzel, in which he was rated a 3 out of 10, was an adverse employment action. (Instrument No. 26-1, at 3, 8-11). Plaintiff argues that the performance review was an adverse employment action because it served as the basis for his later termination. (Instrument No. 26-1, at 8-11). However, although a negative performance review can increase the chance of an adverse employment action, it has a "mere tangential effect" on the future adverse employment action and is not itself an adverse employment action. *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002), *overruled on other*

23

grounds by *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997)).   Here, although the performance review increased Plaintiff's chances of termination, it had only a "tangential effect" on a future adverse employment decision.   *See Mattern*, 104 F.3d at 708.   The review itself was not an adverse employment action.   *See Mattern*, 104 F.3d at 708.

For the above reasons, Plaintiff has failed to establish that an adverse employment action was taken against him prior to his termination.   Plaintiff has therefore failed to meet the third element of his prima facie case under the theory that Defendant discriminated against him by taking the above-described actions prior to his termination.

## ii.

In order to meet the fourth element of a prima facie case under the theory that Defendant discriminated against him prior to his termination, Plaintiff must present evidence that a similarly situated employee outside of his protected class was treated more favorably than he was.   *See DeCorte*, 497 F.3d at 437.   The Fifth Circuit defines "similarly situated" narrowly.   *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 n.33 (W.D. Tex. 2007).   "Similarly situated" employees are employees who are treated more favorably in "nearly  identical" circumstances.   *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).   "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."   *Lee*, 574 F.3d at 259-60.   Where different decision makers or supervisors are involved, their decisions are

rarely "similarly situated" in relevant ways for establishing a *prima facie* case. *See Perez v. Texas Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004); *Okoye v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors).

Assuming in the alternative that Plaintiff has shown an adverse employment action, Plaintiff has nonetheless failed to show that a similarly situated employee was treated more favorably than he was. He has failed to identify employees that received more resources than him, or who were not issued employee warning notices. He has also failed to identify employees who were assigned to a better office than him while he was on the Enbridge project.

With respect to his job transfers from Zhonga's group to the Enbridge project and then Bigelow's group, Plaintiff argues that he was treated less favorably than five engineers who were hired to work in Zhonga's group while Plaintiff was working on the Enbridge project. (Instrument No. 26-1, at 8). Unlike Plaintiff, these engineers were not transferred to the Enbridge project or Bigelow's group, and were not of Iranian origin. However, Plaintiff has failed to provide any further details regarding these engineers, such as whether they held the same job or responsibilities as Plaintiff, or had received similar employee warning notices. Plaintiff has thus failed to show that these five engineers were similarly situated to himself. *See Lee*, 574 F.3d at 259-60.

Plaintiff has also failed to show that he was treated less favorably than similarly situated employees in Bigelow's group. He argues that Bigelow placed him under the supervision of two engineers with lower ranks than himself. However, he has failed to provide any further details

regarding these engineers, such as their job responsibilities or whether they had received a similar employee warning notice. *See Lee*, 574 F.3d at 259-60.

Finally, Plaintiff has failed to identify any employees with similar jobs and warning notice histories who received larger bonuses or better performance reviews than he received.

For the above reasons, Plaintiff has failed to establish that a similarly situated employee was treated more favorably than himself. Plaintiff has therefore failed to meet the fourth element of his prima facie case under the theory that Defendant discriminated against him prior to his termination.

### b.

Plaintiff's second theory of discrimination is that Defendant discriminated against him by by terminating him as part of Defendant's workforce reduction. (*See* Instrument No. 26-1, at 2-12). As stated above, in a reduction-in-force case, a plaintiff establishes a *prima facie* case by showing (1) that he is a member of a protected class; (2) that he has been adversely affected by the employer's decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) that there is circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. *Nichols,* 81 F.3d at 41; *Williamson,* 695 F.Supp.2d at 449-50.

The Parties do not dispute that Plaintiff is a member of a protected class, or that he was adversely affected by his termination. (*See* Instrument No. 18, at 21-24; Instrument No. 26, at 4). However, Plaintiff must also establish that he was qualified to assume another position at the time of his discharge, and that there is circumstantial or direct evidence from which a factfinder

might reasonably conclude that Defendant intended to discriminate against him by terminating him. *See Nichols*, 81 F.3d at 41; *Williamson*, 695 F.Supp.2d at 449-50.

In a reduction-in-force case, Plaintiff is not required to provide evidence showing that he was replaced by someone outside of his protected class. *Williams v. General Motors Corp.*, 656 F.2d 120, 128 (5th Cir. 1981). Plaintiff is merely required to allege that, despite being qualified for his position, younger, less-experienced engineers were hired prior to his termination and a younger employee was hired to replace him. *See Thornbrough v. Columbus and Greenville R.R. Co.*, 760 F.2d 633, 643-44 (5th Cir. 1985), *overruled on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 513 (1993)(plaintiff's allegations that "several younger, allegedly less well-qualified employees were retained during the Railroad's reduction-in-force, and that at the time of his discharge two younger, allegedly less-well qualified employees were hired... are sufficient to support a prima facie case."). The Fifth Circuit has stated:

> [W]hat is suspicious in reduction-in-force cases is that the employer fired a qualified older employee but retained younger ones. If we focus not on why employees, in general, were discharged...but instead on why the plaintiff rather than another employee was discharged, the discharge of an older employee rather than a younger one is initially unexplained. Under these circumstances, requiring the employer to articulate reasons for his decision to fire the plaintiff is appropriate.

*Thompson v. Origin Tech. In Bus., Inc.*, No. 3:99-CV-2077-L, 2001 WL 1018748 (N.D.Tex. Aug. 20, 2001) at *5-6 (citing *Thornbrough*, 760 F.2d at 643-44).

Defendant argues that Plaintiff cannot show that he was qualified for another position at the time of his discharge, due to Defendant's workforce reduction, when he was terminated there were simply no available positions for which he was qualified. (Instrument No.

18, at 21). Defendant furthermore argues that Plaintiff has not provided circumstantial or direct evidence from which a factfinder might reasonably conclude that Defendant intended to discriminate against him by terminating him. (Instrument No. 18, at 21-23). According to Defendant, Plaintiff cannot meet this prong of his *prima facie* case because he has not shown that he was treated less favorably than similarly situated employees outside his protected class. (Instrument No. 18, at 22-23).

However, Plaintiff argues that eleven days before his termination, he was replaced by a 40 year old senior project engineer. (Instrument No. 26-1, at 11). Plaintiff also alleges that Defendant hired many younger and less-experienced engineers prior to his termination, but did not lay off those engineers. (Instrument No. 26-1, at 11).

Here, neither Party has disputed that Plaintiff was qualified for his position. (*See* Instrument No. 18, at 21-24; Instrument No. 26, at 4). Because this is a reduction-in-force case, Plaintiff's allegations that younger, less-experienced engineers were hired prior to his termination and that he was replaced by a younger employee are thus sufficient to establish a prima facie case of discrimination. *See Thornbrough,* 760 F.2d at 643-44. Plaintiff is not required to provide evidence showing that he was replaced by someone outside of his protected class. *Williams,* 656 F.2d at 128. He is also not required to show that his employer had an available position for which he was qualified at the time of termination, or that he was treated less favorably than a "similarly situated employee." *See Thornbrough,* 760 F.2d at 643-44. Viewing the record in the light most favorable to the Plaintiff, Plaintiff has established a *prima facie* case of discrimination with respect to his termination.

**2.**

If Plaintiff establishes a *prima facie* case of employment discrimination, the burden then shifts to Defendant to show a legitimate and nondiscriminatory basis for the adverse employment decision. *Portis*, 34 F.3d at 328. However, Defendant need not persuade the court that it was actually motivated by the proffered reasons. *See Bd. of Trustees of Keen State College v. Sweeney*, 439 U.S. 24, at 25. It is sufficient if Defendant's evidence raises an issue of fact as to whether it discriminated against Plaintiff. *Jones v. Flagship Intern*, 793 F.2d 714, 725 (5th Cir. 1986).

Although Plaintiff has not established a *prima facie* case of discrimination based on Defendant's actions prior to his termination, he has established a *prima facie* case based on his termination. The below analysis will nonetheless address Defendant's actions prior to his termination, as well as his termination.

**a.**

Plaintiff has not established a *prima facie* case of discrimination based on Defendant's actions prior to his termination. However, the Court will in the alternative address whether Defendant has proffered legitimate and nondiscriminatory reasons for those actions. Plaintiff has identified two examples to support his general allegation that Defendant denied him resources. In the first example, Plaintiff alleges that Netzel denied his request for an immediate plotting of certain drawings. (Instrument No. 18-1, at 55; Instrument No. 26-1, at 4). However, Netzel states that he denied the request because "in a fast paced resource constrained environment.. sometimes his [Plaintiff's] project will not have the top priority." (Instrument No. 18-1, at 55). In the second example, Plaintiff alleges that Zhonga and Andrus denied him "the designers and

draftsmen that I [Plaintiff] needed" for his work on the Enbridge project. (Instrument No. 26-1, at 6). However, Zhonga and Andrus state that Defendant did not need to work with additional staff on the Enbridge project because it was so small. (*See* Instrument No. 18-1, at 22, 28). Netzel, Zhonga and Andrus have provided legitimate and nondiscriminatory reasons for denying Plaintiff resources.

Plaintiff has also alleged that when he worked on the Enbridge project under Andrus, he was assigned an office that was "a storage room full of unwanted stuff … which humiliated me [Plaintiff] in front of other staff." (Instrument No. 26-1, at 6). However, Andrus states that Plaintiff's problem with the office was that it lacked windows. (Instrument No. 18-1, at 26-27). Andrus also states that the office was larger than windowed offices at the same location, and that when Plaintiff first arrived at the Enbridge project, no windowed offices were available. (Instrument No. 18-1, at 26-27). Andrus has provided legitimate and nondiscriminatory reasons for assigning Plaintiff to the office.

It is also Plaintiff's position that Netzel's issuance of an employee warning notice to him was made after he "complained about discriminatory treatment." (Instrument No. 26-1, at 4). However, Netzel states in the notice that, in response to Netzel's denial of his request for plotting a drawing, Plaintiff threatened him with legal action. (Instrument No. 18-1, at 55). Netzel furthermore states "it is not acceptable to threaten the company, his piers [sic] or his supervisor." (Instrument No. 18-1, at 55). Plaintiff's threat to Netzel was a legitimate and nondiscriminatory reason for Netzel to issue the warning notice.

According to Plaintiff, the evidence also shows that Zhonga transferred him to Andrus's group, to work on the Enbridge project, in order to isolate him from his peers and punish him.

(Instrument No. 26-1, at 5).  However, Zhonga states that he transferred Plaintiff to give him "a second chance" after "his symptoms of no team effort, having arguments with Netzel." (Instrument No. 18-1, at 22).  In addition, Plaintiff has alleged that his subsequent transfer to Bigelow's group rather than back to Zhonga's group was discriminatory.  (Instrument No. 26-1, at 8-9).  However, Andrus states that he decided to end Plaintiff's time on the Enbridge project because "John's contribution had been diminishing to the point where we could no longer in our minds fairly bill the client for his time." (Instrument No. 18, at 4; Instrument No. 18-1, at 29). Furthermore, as previously mentioned, Zhonga did not want Plaintiff in his group, where he would be supervised by Netzel, because Plaintiff and Netzel had been arguing with each other. (*See* Instrument No. 18-1, at 22).   Zhonga and Andrus have provided legitimate and nondiscriminatory reasons for Plaintiff's transfers to Andrus's group and Bigelow's group.

Plaintiff also took issue with Netzel's performance review, in which he was rated a 3 out of 10, was discriminatory.  However, in the performance review, Netzel states that he has consulted Plaintiff's other supervisors, and based the rating on the fact that Plaintiff had demonstrated "lapses of judgment" in his work for Andrus and Bigelow; that Plaintiff's team work and ability to cooperate with others needed "significant improvement"; that Plaintiff's attendance "needed improvement"; and that his work pace and attention to detail were "average". (Instrument No. 18-1, at 103-105).  Netzel also states that although Plaintiff "needs to deepen his technical knowledge," his drawing development work was "acceptable" and his understanding of the drawing design cycle was "good".   (Instrument No. 18-1, at 103-105).  Netzel's basis for giving Plaintiff a poor performance review was legitimate and nondiscriminatory.

Finally, Plaintiff has also identified several allegedly discriminatory actions which Defendant has not explained.  For example, Defendant has proffered any reasons for why Bigelow placed Plaintiff under the supervision of two engineers who allegedly were Jewish and had lower ranks than him.  Defendant has also not proffered any reasons for why Plaintiff's 2007 bonus was reduced.

For the above reasons, assuming in the alternative that Plaintiff has established a *prima facie* case of discrimination based on Defendant's actions prior to his termination, Defendant has met its burden of proffering legitimate reasons for its actions regarding denial of resources; office assignment; warning notice; job transfers; and performance review.  However, Defendant has not met this burden for its actions regarding Plaintiff's position in Bigelow's group and Plaintiff's reduction in bonus.

### b.

Plaintiff has established a *prima facie* case of discrimination based on his termination. Thus, the Court will address whether Defendant has proffered a legitimate and nondiscriminatory reason for his termination.  Defendant argues that his termination was part of a legitimate reduction in force which occurred in response to a reduction in billable work.  (Instrument No. 18-1, at 45-48, 107-108).  Defendant furthermore argues that Plaintiff was included in the reduction in force solely on the basis of his performance review rating.  (Instrument No. 18, at 23).  Because a reduction in force is a legitimate, nondiscriminatory reason for discharge, Defendant has met its burden of proffering a legitimate and nondiscriminatory reason for Plaintiff's discharge.  *See Williamson v. American Nat. Ins. Co.*, 695 F.Supp.2d 431, 449-450

(S.D.Tex. Mar. 2, 2010)(citing *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) ("A reduction in force is itself a legitimate, nondiscriminatory reason for discharge.")).

### 3.

If the defendant meets its burden of proffering a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the offered reason is pretext or unworthy of belief. *Portis*, 34 F.3d at 328. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [defendant's] explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 2101-02. Although the plaintiff is not required, upon proving that the defendant's reason is a pretext, to further prove that the defendant's employment action was in fact discriminatory, the trier of fact can infer "the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 2108. Plaintiff bears the ultimate burden of proving intentional discrimination at all times. *St. Mary's*, 113 S.Ct. at 2747-48.

Defendant has met its burden of proffering a legitimate and nondiscriminatory reason for Plaintiff's discharge by stating that Plaintiff was discharged as part of Defendant's reduction in force. However, Plaintiff has failed to show that Defendant's reason for his termination is pretext or unworthy of belief.

Plaintiff argues that his discharge was discriminatory because he was chosen for discharge over younger and less qualified engineers. (Instrument No. 26-1, at 11). However, according to Donahue, Defendant's Vice President of Human Resources, employees were chosen to be part of the reduction in force based on their performance reviews. (Instrument No. 18-1, at

111). The first round of lay-offs included employees with ratings of 4 or below, and the second round of lay-offs included employees with ratings of 6 or below. (Instrument No. 18-1, at 111). Because Plaintiff had received a rating of 3, he was properly included in the first round of lay-offs. Furthermore, Plaintiff's rating of 3 was based on legitimate and nondiscriminatory reasons. In the performance review, Netzel states that he has consulted Plaintiff's other supervisors, and based his rating on the fact that Plaintiff had demonstrated "lapses of judgment" in his work for Andrus and Bigelow; that Plaintiff's team work and ability to cooperate with others needed "significant improvement"; that Plaintiff's attendance "needed improvement"; and that his work pace and attention to detail were "average". (Instrument No. 18-1, at 103-105). Netzel also states that although Plaintiff "needs to deepen his technical knowledge," his drawing development work was "acceptable" and his understanding of the drawing design cycle was "good". (Instrument No. 18-1, at 103-105). Netzel's basis for giving Plaintiff a poor performance review was legitimate and nondiscriminatory.

Furthermore, the evidence regarding other employees who were laid-off does not support the inference that Plaintiff was chosen for termination based on his age, religion or national origin. To the contrary, the evidence shows that Plaintiff had a similar job and position to other laid-off employees, and that Defendant discharged employees who were younger than Plaintiff, and from different countries than Plaintiff. Defendant's termination records show that 143 total employees including Plaintiff, were laid-off in 2009. (Instrument No. 18-1, at 45-48). Like Plaintiff, 15 of the employees were engineers. (Instrument No. 18-1, at 45-48). In addition, like Plaintiff, 17 of the employees were in Zhonga's group. Donahue states that, of the 17 employees laid-off from Zhonga's group, 14 were younger than Plaintiff, and 2 were of Canadian descent.

(Instrument No. 18-1, at 111-112).  She also states that she did not know the national origins or religions of the other laid-off employees.  (Instrument No. 18-1, at 111-112).

Plaintiff also argues that his discharge was discriminatory because he was replaced by a 40 year old employee.  (Instrument No. 26-1, at 11).  However, although Plaintiff states that he was replaced, he has not provided any further evidence of his replacement, such as a hiring record or statements from others.  On the other hand, Zhonga states that that no one replaced Plaintiff in his position after he was terminated.  (Instrument No. 18-1, at 23).  Furthermore, as discussed above, Defendant discharged at least 14 employees who were younger than Plaintiff. Accordingly, Plaintiff has failed to meet his burden of showing that Defendant's offered reasons for his discharge are pretext or unworthy of belief.

For the above reasons, Defendant's Motion for Summary Judgment with respect to Plaintiff's claims of discrimination on the basis of age, religion and national origin is **GRANTED**.

## 4.

In addition to the above, Defendant makes two additional arguments regarding Plaintiff's discrimination claims.  First, Defendant argues that Plaintiff may not bring his religious discrimination claim because he does not believe in or practice the Muslim religion.  (Instrument No. 18, at 25).  In support, Defendant cites *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 399 (5th Cir. 2000), and *McCracken v. Exxon Mobil Corp.*, No. H-03-5726, 2006 WL 456252, *1 (S.D.Tex. Feb. 23, 2006).  *Rubinstein* and *McCracken* state that the plaintiff must be "a member" of an identifiable religion in order to establish a *prima facie* case. *Rubinstein*, 218 F.3d at 399; *McCracken*, 2006 WL 456252 at *1.  Here, however, Plaintiff states that he has not

practiced or believed in the Muslim religion since the age of 7. (Instrument No. 18-1, at 9-10). His status as "a member" of the Muslim religion is thus tenuous at best. Nonetheless, because the Court has already found that Plaintiff has not established a prima facie case or shown pretext for his discrimination claim based on religion, the Court declines to dismiss this claim on the basis of whether he is a member of the Muslim faith.

Defendant also argues that, under the same-actor doctrine, Plaintiff may not bring his age discrimination claim because Defendant hired him twice when he was well over the age of 40. (Instrument No. 18, at 26). In response, Plaintiff argues that during his first period of employment with Defendant, he was working "through an agent, and not direct, so UEI didn't know about my age or salary." (Instrument No. 26-1, at 1, 3). However, neither party has provided records showing who hired Plaintiff during his first period of employment, or what Defendant knew about Plaintiff's age during his first period of employment. Because the Court has already found that Plaintiff has not established a prima facie case or shown pretext for his discrimination claim based on age, the Court declines to dismiss this claim based on the same actor doctrine.

**B.**

Plaintiff's retaliation claim is examined under the three step shifting burdens analysis set out in *St. Mary's Honor Ctr. v. Hicks*, 113 S.Ct. 2742, 2747-53 (1993). First, a plaintiff must establish a *prima facie* case of alleged wrong-doing by a preponderance of the evidence. *Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001). Once the *prima facie* case is established, defendant has the burden to articulate a legitimate, non-discriminatory reason for its action. *Id.* After the defendant has provided legitimate, non-discriminatory reasons for its action, the burden

36

shifts back to the plaintiff to demonstrate by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.,* 120 S. Ct. 2097, 2106 (2000).

**1.**

A plaintiff establishes a prima facie case of retaliation by showing: "1) that she engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action." *Septimus v. Univ. of Houston,* 399 F.3d 601, 610 (5th Cir. 2005); *Shackelford v. Deloitte & Touche, LLP,* 190 F. 3d 398, 407-08 (5th Cir. 1999).

**a.**

Plaintiff must first show that he engaged in a protected activity. *Septimus,* 399 F.3d at 610; *Shackelford,* 190 F. 3d at 407-08. Protected activity is defined as opposition to any practice rendered unlawful by Title VII, or participation in a Title VII proceeding such making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a); *Shackelford,* 190 F.3d at 408. In order to show opposition to a practice that is unlawful under Title VII, the plaintiff need not prove that an employer's practices were actually unlawful under Title VII. *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 428 (5th Cir. 2000). However, the plaintiff must show that he had "a reasonabl[e] belief that the employer was engaged in unlawful employment practices." *Byers,* 209 F.3d at 428.

Plaintiff alleges that he complained about unlawful discrimination in 2007, 2008, and 2009, throughout his second period of employment with Defendant. (Instrument No. 26-1, at 2).

However, Plaintiff has identified only four complaints during this period. These complaints were emailed to supervisors and human resource personnel with his employer, and were not part of a Title VII proceeding. In order to show that the complaints were a protected activity, Plaintiff must therefore show that he filed them in opposition to a practice that he reasonably believed was unlawful under Title VII. *Byers*, 209 F.3d at 428.

Plaintiff states that he filed a complaint for discrimination and retaliation on September 17, 2007, the day that he received Netzel's employee warning notice. (Instrument No. 26-1, at 5). Plaintiff has not provided the complaint or described its contents. Nonetheless, it appears from Plaintiff's timing that his complaint was made in opposition to the warning notice. If so, Plaintiff has failed to show that he had a reasonable belief that Netzel's issuance of the warning notice was unlawful under Title VII. As discussed above, the evidence shows that Netzel issued the notice because Plaintiff had threatened him with legal action, not because he was discriminating against Plaintiff. Furthermore, because Plaintiff has not identified any complaints made prior to the notice, Plaintiff cannot show that he had a reasonable belief that the notice was retaliatory. Accordingly, Plaintiff's September 17, 2007 complaint does not qualify as protected activity.

On January 9, 2009, Plaintiff emailed Zhonga, Netzel, Minotti and King regarding his December 8, 2008 performance evaluation, in which Netzel rated him a 3 out of 10. (Instrument No. 18-1, at 60-61, 103-105). In the email, Plaintiff argues that the evaluation was inaccurate and unfair. (*See* Instrument No. 18-1, at 60-61). He does not, however, allege that the evaluation was discriminatory, retaliatory, or linked in any way to his age, religion or national origin. (*See* Instrument No. 18-1, at 60-61). Furthermore, as previously discussed, the evidence

shows that Netzel based his evaluation on information from Plaintiff's supervisors and Plaintiff's actual job performance, rather than a discriminatory reason. Plaintiff's email fails to provide any additional evidence showing that he had a reasonable belief that the performance evaluation was unlawful under Title VII. Therefore, Plaintiff's January 9, 2009 email does not qualify as a protected activity.

On January 19, 2009, Plaintiff emailed Andrus, King, and Manning regarding his December 8, 2008 performance evaluation. As in the preceding email, Plaintiff again argues that the evaluation was inaccurate and unfair. (*See* Instrument No. 26-2, at 1-7). In addition, he alleges that his rights "have been violated" and that his supervisors are "discriminating against me." (Instrument No. 26-2, at 2). Nonetheless, as stated above, the evidence here shows that the evaluation which Plaintiff objects to was legitimate and nondiscriminatory. Plaintiff's January 19 email, like his January 9 email, fails to provide any additional evidence showing that he had a reasonable belief that the evaluation was unlawful. Accordingly, Plaintiff's January 19, 2009 email does not qualify as a protected activity.

Finally, on February 2, 2009, Plaintiff emailed King and Manning alleging that Zhonga had conspired with others to unfairly discriminate and retaliate against him. (Instrument No. 18-1, at 63). However, his email did not identify specific examples of Zhonga's discrimination or retaliation. Plaintiff attached 23 documents to the email, consisting of emails concerning Plaintiff's 2006 job offer, and various emails from his second period of employment with Defendant. (Instrument No. 18-1, at 64-91). Plaintiff states that the attached documents show that his performance evaluation from Zhonga was unfair, but does not provide further details explaining how. (Instrument No. 18-1, at 63). Furthermore, although Plaintiff refers to an

evaluation from Zhonga rather than Netzel, he has not provided the Court with an evaluation from Zhonga.

Here, because Plaintiff's email fails to identify specific examples of Zhonga's discrimination or retaliation, it is unclear what practices Plaintiff was opposing in the email. However, as the Court has already found, the record does not support the inference that Defendant had a discriminatory reason for any of the allegedly adverse employment actions identified by Plaintiff in this case. In addition, Plaintiff has not provided evidence showing that he had a reasonable belief for believing that any of the allegedly adverse employment actions were unlawful. Therefore, Plaintiff's February 2, 2009 email is not a protected activity.

For the above reasons, the Court finds that Plaintiff has not shown that he engaged in a protected activity.

### b.

Under the second prong of the *prima facie* test for retaliation, Plaintiff must present evidence that he suffered a materially adverse employment action. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Smith v. Equitrac Corp.,* 88 F. Supp. 2d 727, 744 (S.D. Tex. 2000). Adverse employment actions are actions that a reasonable employee would find to be materially adverse and which would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68.

**i.**

Plaintiff argues that Defendant retaliated against him prior to his termination by denying him resources; giving him a warning notice and a bad office; transferring him to the Enbridge project and Bigelow's group; reducing his bonus; and giving him a poor performance review. Although the Court has already found that none of these actions satisfy the ultimate employment decision standard for an adverse employment action determination in a discrimination claim, the Court here considers whether these actions satisfy the standard set forth in *Burlington Northern* for an adverse employment action determination in a retaliation claim.

As previously discussed, although Plaintiff alleges that he was denied resources, instead of providing evidence that those denials were materially adverse, he states that he nonetheless did "excellent" work. (Instrument No. 26-1, at 7). In addition, although Plaintiff alleges that he was assigned to a bad office, he has not shown how the office assignment prevented his "excellent" work or dissuaded him from complaining of discrimination. Plaintiff also alleges that his 2007 warning notice from Netzel was materially adverse, but has failed to provide evidence showing that it resulted in any later disciplinary consequences. In addition, Plaintiff has not provided evidence showing that his transfers to the Enbridge project and Bigelow's group were materially adverse. To the contrary, the record shows that they were lateral job transfers that did not harm Plaintiff's compensation or opportunities for advancement. Accordingly, Plaintiff has failed to show that he suffered a materially adverse employment action for his retaliation claim when Defendant denied him resources, gave him a bad office and a warning notice, and transferred him to the Enbridge project or Bigelow's group.

41

Plaintiff argues that his reduction in bonus was an adverse employment action for the purposes of his retaliation claim. However, his argument is not supported by case law. In *Ford v. Diversified Technology, Inc.*, No. 3:99-CV-435WS, 2008 WL 5272090 (S.D. Miss. Dec. 17, 2008), the court found that the employer's denial of a yearly bonus after the plaintiff had received a bonus for fifteen years qualified as an adverse employment action for a retaliation claim. *Ford*, 2008 WL 5272090 at *5. In *Williams v. J.B. Parks Wholesale Florist, Inc.*, No. 3:95-CV-2599-D, 1997 WL 160194 (N.D. Tex. March 31,1997), the court also found that the employer's denial of a bonus was an adverse employment decision for a retaliation claim. *Williams*, 1997 WL 160194 at *7. The plaintiff in *Williams* received a $50 cash bonus and thank you note from a previous manager with her employer. *Williams*, 1997 WL 160164 at *7. However, her current manager took the bonus and note away from her and did not allow her to keep them. *Williams*, 1997 WL 160194 at *7.

By contrast, in *Turner v. DynMcDermott Petroleum Operations Co.*, No. 06-1455, 2010 WL 4363403, the court found that the employer's reduction in bonus did not constitute an adverse employment action for the plaintiff's retaliation claim. *Turner*, at *3. The court's finding was based on two reasons. First, although the plaintiff's bonus was reduced by $5000, he had received a raise of nearly the same amount. *Turner*, at *3. Second, the plaintiff's bonus was discretionary. *Turner*, at *3. The court stated: "The denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary." *Turner*, at *3.

42

Here, in contrast to *Ford* and *Williams*, Plaintiff's bonus was reduced rather than denied. In addition, unlike the plaintiff in *Ford*, Plaintiff did not receive a bonus for fifteen years before his 2007 reduction. Furthermore, unlike the plaintiff in *Williams*, Plaintiff did not receive his bonus before it was taken away from him. Instead, the facts here are similar to those in *Turner*. The record does not show whether, like the plaintiff in *Turner*, Plaintiff received a raise which canceled out the effect of his reduction in bonus. *See Turner*, 2010 WL 4363403 at *3. However, like the plaintiff in *Turner*, Plaintiff's bonus was reduced rather than denied. In addition, the bonus here, like the bonus in *Turner*, was not a component of Plaintiff's salary. *See Turner*, 2010 WL 4363403 at *3. Plaintiff's reduction in bonus thus does not qualify as an adverse employment action.

Finally, Plaintiff argues that his December 2008 performance evaluation from Netzel was an adverse employment action for his retaliation claim. In the context of a retaliation claim, negative performance reviews have been found to be adverse employment actions. *See, e.g., Arensdorf v. Snow*, 2006 WL 3302532 *14 (S.D.Tex. Nov. 13, 2006)(finding that the plaintiff's poor performance review and exclusion from a flex-time program were adverse employment actions); *Klebe v. Univ. of Texas Health Science Ctr at San Antonio*, 2009 WL 3756704 *3 (W.D.Tex. Nov. 6, 2009)(finding that two performance reviews stating that plaintiff "needs improvement" were adverse employment actions). Here, Plaintiff's employment rating was a 3 out of 10, stated that he had demonstrated "lapses in judgment" in getting along with others, and described several ways in which he should "improve." The negative nature of his rating and comments is sufficient to "dissuade a reasonable worker from making or supporting a charge of

discrimination." *See Burlington Northern*, 548 U.S. at 68.   Therefore, Defendant's issuance of the performance review is an adverse employment action for Plaintiff's retaliation claim.

Accordingly, the Court finds that Defendant did not perform adverse employment actions by denying Plaintiff resources; giving him a warning notice and a bad office; transferring him to the Enbridge project and Bigelow's group; or reducing his bonus.   However, Defendant performed an adverse employment action by giving Plaintiff a poor performance review.

**ii.**

The Court finds that Defendant's termination of Plaintiff was an adverse employment action.   The Parties do not dispute that Defendant's termination of Plaintiff in February 2009 was an adverse employment action.   (*See* Instrument No. 18, at 21-24; Instrument No. 26, at 4).

**c.**

Under the third element of a *prima facie* case of retaliation, Plaintiff must establish that a causal link exists between his protected activity and his adverse employment action.   *Lemaire*, 480 F.3d at 388.   The standard for establishing the causal link element in a retaliation claim is less stringent than a "but for" standard.   *Stroud v. BMC Software Inc.*, No. 07-20779, 2008 WL 2325639, at *5-6 (5th Cir. June 6, 2008) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).   Plaintiff does not have to prove that unlawful retaliation was the sole reason for her termination.   *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, and n. 7 (1989).

Because employers "rarely leave concrete evidence of their retaliatory purposes and motives," causation is difficult to prove; courts therefore use indicia of causation in Title VII cases.   *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994).   Factors that courts look to for guidance in determining causation include (1) the employee's past disciplinary

record; (2) whether the employer followed its typical policy and procedures in taking adverse action; and (3) the temporal relationship between the employee's protected activity and the adverse action. *Id.*; *McCoy*, 492 F.3d at 562 ("Close timing between an employee's protected activity and an adverse action against her may provide the causal connection required to make out a *prima facie* case of retaliation.") (citing *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).  The Supreme Court has noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a *prima facie* case" require "very close" temporal proximity. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

Here, assuming in the alternative that Plaintiff's complaints were protected activities, Plaintiff has identified complaints made on September 17, 2007; January 9, 2009; January 19, 2009; and February 2, 2009.  Plaintiff has also shown two adverse employment actions: his December 2008 performance review, and his February 2009 termination.

Plaintiff's December 2008 performance review occurred around a little over one year after his first complaint, and before his remaining three complaints.  There is therefore no temporal relationship between his complaints and the review.  In addition, Donovan King, Defendant's Human Resource Manager, states that he investigated Plaintiff's claims of retaliation and discrimination concerning the review.  In his declaration, he does not state whether Netzel followed Defendant's typical policy and procedures in issuing the review. However, he states that he spoke to Plaintiff, Netzel, Andrus and Zhonga regarding the review, and concludes that Plaintiff's claims of retaliation and discrimination were unfounded. (Instrument No. 18-1, at 112).  The Court finds that Plaintiff has failed to show a causal link between his performance review and his complaints.

45

Plaintiff's February 2009 termination occurred well over one year after his first complaint, but within one about month of his remaining complaints. However, although the timing of his termination weighs in favor of finding a causal link, Defendant has also provided evidence that it followed typical policy and procedures in his termination. As previously discussed, Defendant's reduction in force was designed to target employees with a rating of 4 or below in the first round of lay-offs, and employees with a rating of 6 or below in the second round. Because Plaintiff's rating was a 3, he was properly included in the first round of layoffs. Furthermore, Defendant's records show that a total of 143 employees were laid-off in 2009, with the lay-offs occurring both before and after Defendant's February 2009 termination. The Court finds that Plaintiff has failed to show a causal link between his termination and his complaints.

Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of retaliation.

**2.**

Assuming arguendo that Plaintiff has established a prima facie case of retaliation, the burden then shifts to Defendant to state a legitimate non-retaliatory reason for its action, and any presumption of retaliation drops from the case. *Septimus*, 399 F.3d at 610-11. As the Court has already found in its analysis of Plaintiff's discrimination claims, Defendant has met its burden of providing legitimate and nondiscriminatory reasons for its actions. The same analysis applies here.

**3.**

If the defendant provides legitimate and nondiscriminatory reasons for its actions, the plaintiff must then show that the defendant's stated reasons are a pretext for retaliation. *Septimus*, 399 F.3d at 610-11.  As the Court has already found in its analysis of Plaintiff's discrimination claims, Plaintiff has failed to meet its burden of proving intentional discrimination, and of showing that Defendant's offered reasons are pretext or unworthy of belief.  The same analysis applies here.

For the above reasons, Defendant's Motion for Summary Judgment with respect to Plaintiff's claim of retaliation is **GRANTED**.

**IV.**

For the above reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. **(Instrument No. 18).**

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 31st day of August, 2011, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**